UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| SONNY R. HARDIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2: 18 CV 6 DDN |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Sonny R. Hardin for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401-434, and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is reversed and remanded.

## I. BACKGROUND

Plaintiff was born in 1964 and was 50 years old at the time of his hearing. He filed his applications for disability insurance benefits and for SSI on August 9, 2016 and September 30, 2014, respectively. (Tr. 192-98, 163-68.) He alleged that he became disabled on August 15, 2014, due to heart disease, HIV/AIDS, "no immune system," high blood pressure, pain, fatigue, and weight loss. (Tr. 163-68, 203.) His application was denied, and he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 91-98.)

On February 1, 2017, following a hearing, an ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 20-27.) The Appeals Council denied his request for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to this appeal.

Plaintiff was diagnosed with HIV in 1998. He was admitted to University Hospital in Columbia, Missouri, from September 9-12, 2014, with fever and chills due to complications from HIV that went untreated for two years. Plaintiff had shortness of breath, dyspnea on exertion, chest pain aggravated by activity, dehydration, dry mouth, lightheadedness, dizziness, diarrhea, decreased urine output, blurry vision, abdominal bloating, back pain, abdominal pain and cough. He was alert, in no acute distress, had regular cardiac rate and rhythm, and clear lungs. He had normal musculoskeletal range of motion, no tenderness, and no swelling. Plaintiff had been receiving Highly Active Antiretroviral Therapy (HAART) until two years earlier when he was hospitalized for severe bodily burns, placed in a coma, and provided multiple skin grafts. He was unable to afford HAART after discharge for reasons concerning insurance coverage. He had a history of drug use and had last used methamphetamine one week earlier. He was a cigarette smoker for 41 years.

He was diagnosed with febrile neutropenia from HIV. He had pancytopenia, a condition marked by a reduction in the number of red and white blood cells, as well as platelets. A CT scan showed left axillary lymphadenopathy, a disease of the lymph nodes, that was concerning for Kaposi sarcoma. A biopsy and complete lymphoma work-up were performed. Upon discharge on September 12, 2014, plaintiff was improved, had no restrictions, and could resume normal activities as tolerated. (Tr. 251-88, 320.)

Plaintiff was admitted to the University Hospital from September 22-24, 2014 for a dog bite and subsequent infection. He was administered IV antibiotics in light of his immune status. Plaintiff was compliant with HAART and other medications but continued to have weight loss and diarrhea in addition to extreme pain near the biopsy site and numbness in his shoulder. He denied any fevers, chills, vomiting, or diarrhea. He had no neurological deficits. He had intact range of motion of the right hand with no obvious joint swelling. (Tr. 314-36.)

On September 30, 2014, plaintiff was seen for follow-up for the dog bite due to concerns with infection and HIV-positive status. Notes indicated there were no concerns regarding further healing. (Tr. 353-55.)

On October 3, 2014, plaintiff was seen for follow-up. Swelling in his lymph nodes had increased and was now associated with numbness. His CD4 count or T-cell test, used to determine the status of a person's immune system, was 10. His viral load test, used to determine the level of HIV in the body, was approximately 75,000. His diarrhea was resolving. He had no musculoskeletal swelling or gross restricted range of motion. (Tr. 346-48.)

On November 7, 2014, plaintiff was seen at the University of Missouri Specialty Clinic for follow-up. Swelling in the left axilla had decreased but numbness was still present. He was gaining weight and was taking prescribed medications. (Tr. 341-45).

On May 12, 2015, plaintiff was seen at the infectious disease clinic for HIV follow-up and a swollen lymph node. He was taking Atripia, for HIV, and Dapsone, an anti-infective used to treat skin conditions. His last CD4 cell count was 90. He had issues with scratching. He was having some compliance issues with medications. (Tr. 356-57.)

On June 5, 2015, plaintiff was seen at Missouri Orthopedic Institute for painful warts on his left foot for the past 2 years. Notes indicate he was immunosuppressive with HIV and AIDS, as well as hepatitis and heart problems. His pain was rated 8 out of 10, and worse with activity. Thermal ablation was performed on his warts. (Tr. 362-63.)

On July 1, 2015, plaintiff saw Matthew Collard, M.D., for bilateral hand parenthesis. He was diagnosed with bilateral hand medial neuropathy across both wrists consistent with moderate to severe carpal tunnel. Dr. Collard believed he would benefit from a carpal tunnel release. Dr. Collard also opined that the neuropathy in plaintiff's elbows and extremities was likely related to his medications and disease process, rather than any further work-relatedness or related to any previous occupation. (Tr. 424-25.)

On August 7, 2015, he was seen for evaluation of a wart on his left foot and thermal ablation was performed again. On August 17, 2015, an excisional biopsy of soft tissue lesion and thermal ablation of the suspected wart were performed. On August 28, 2015, plaintiff was seen for follow-up on the warts. (Tr. 364-67, 374.)

On September 11, 2015, plaintiff was seen in the infectious disease clinic for HIV follow-up. He was compliant with medications, which were modified due to viral resistance. He was experiencing symptoms of bronchitis for over two weeks that were not improving with over the counter medications. He denied fever, headaches, chills, shortness of breath, diarrhea, or dysuria. (Tr. 375-76.)

On October 1, 2015, plaintiff underwent left carpal tunnel release. On October 15, 2015, he underwent a second hand carpal tunnel release. (Tr. 427-28.)

On October 6, 2015, plaintiff was seen for follow-up on his warts. Plaintiff was doing well overall and his pain was improving. He denied any constitutional problems and had no additional complaints. He had complete resolution of the verruca and could resume all pre-procedure activities. (Tr. 378.)

On December 1, 2015, plaintiff was seen at the Infectious Disease Clinic for HIV follow-up. He reported tinnitus or ringing with possible hearing loss and occasional vertigo. His HIV medications were adjusted. An addendum dated December 7, 2015 noted "good news that his viral load was undetectable" and his CD4 was going up slowly. (Tr. 379-81.)

On December 18, 2015, plaintiff saw Dr. Collard for follow-up on his carpal tunnel releases. He had continued stiffness and pain in both hands. He had difficulty removing bolts or opening jars. He had pain in his neck, shoulders, and both arms. Dr. Collard opined that pre-existing degenerative changes were causing ongoing issues with his hand functioning. Dr. Collard further stated that plaintiff had an overall good clinical result from his carpal tunnel releases and should continue home exercises as his strength will continue to improve. Plaintiff stated that he was overall happy with his care and treatment. Dr. Collard released plaintiff at maximum medical improvement without work restriction. (Tr. 416-17.)

On December 21, 2015, plaintiff was seen at an otolaryngology clinic for progressively worsening ringing in his ears for more than a year. An audiogram showed mild sensorineural hearing loss. Although a possible side effect of medications was considered as a cause, he was advised not to stop his HIV medication. (Tr. 386-88.)

On May 24, 2016, plaintiff was seen by Dr. Salzer at the Infectious Disease Clinic for HIV follow-up. Plaintiff complained about his right knee, which was swelling and causing pain when weight was applied. (Tr. 391-95.)

On May 27, 2016, plaintiff was seen by James A. Keeney, M.D., at the Missouri Orthopedic Institute with chronic right knee pain. He was able to walk a mile, although with discomfort. A possible meniscus tear was discussed, and he received an intra-articular injection. (Tr. 396-97.)

A June 13, 2016 MRI of plaintiff's right knee showed a horizontal cleavage tear, multiple cysts along the posterior border of the posterior cruciate, cartilage loss, small cartilage ulceration, and moderate osteoarthritis. (Tr. 398-99.)

On August 17, 2016, plaintiff saw David Volarich, D.O., for an independent medical examination. On examination, plaintiff had symmetric muscle bulk and tone in the upper and lower extremities and had 5/5 strength in the shoulder, biceps, triceps, and lower extremity, and 4/5 strength in the forearms. Dr. Volarich noted plaintiff was a

smoker and instructed him to stop. Dr. Volarich diagnosed carpel tunnel syndrome, HIV/AIDS requiring extensive chemotherapy causing peripheral neuropathy, past history of pneumocystis and pulmonary infection, coronary artery disease, and second degree burns. He noted that plaintiff was able to get his HIV/AIDS under control with medications. (Tr. 400-15.)

Dr. Volarich opined that a 40% permanent partial disability to the body as a whole due to HIV/AIDS infection and accounting for peripheral neuropathy involving the upper and lower extremities. He limited plaintiff to avoid using elbows, forearms, wrists, and hands in an awkward or blind fashion. He should minimize repetitive gripping, pinching, squeezing, pushing, pulling, twisting, rotary motions and similar tasks and limit use to as needed. He should avoid impact and vibratory trauma to the arms and use appropriate braces. He should handle weights to tolerance with the arms dependent, close to the body and not more than 15 to 20 pounds. He was advised to continue strengthening and stretching. (Tr. 400-15.)

**ALJ Hearing**

On August 23, 2016, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 441-74.) He was born on January 19, 1964. He was diagnosed with HIV/AIDS in 1998. He lost his insurance in 2013 and became very ill before he was able to receive treatment again. He contracted pneumonia and was hospitalized for one week. Around early 2015, he resumed taking two HIV medications, although one had stopped being effective. When the medication stopped working he became easily sick, nauseated, and fatigued. He was currently taking the most recently FDA approved medication for HIV. He does not feel any better on new medication and cannot regain his energy. He has difficulty getting up and opening a bottle or pack of sugar. He has considerable fatigue and nausea. (Tr. 447-52.)

In 2013, he was able to live alone and take care of all of his daily needs. By July or August 2014 his health began to deteriorate. He was no longer able to shop in stores, go to appointments, get out of bed in the morning, get dressed, and perform other daily activities. He lost his job at Walker's Automotive in July 2014 when he was no longer able to work every day because of nausea, fatigue, throwing up, and pneumonia. His wife assumed taking care of the house and shopping for groceries. His mother-in-law also lived with him and his wife for a while. He lost thirty to forty pounds. His landlord took care of the lawn during that time. (Tr. 452-57.)

He is able to run the washing machine and occasionally clean dishes. He can go to the store for a few items and assist in taking care of their two cats and two dogs. His wife does the cooking and prepares meals that he can then microwave. He cannot stand for periods of time without pain and weakness. He gets dizzy and fatigued, and has restless leg syndrome. He can stand for only minutes at a time. He stays in bed approximately twelve to fourteen hours a day. He feels low energy and nauseated all of the time. He has tried to take his medication at different times of the day but still feels poorly. He had surgery for carpal tunnel syndrome in 2015 but still has limitations from it. A nerve conduction test was abnormal. He has no grip and can barely write. He frequently drops small items. Every day is a battle for him. (Tr. 457-71.)

### III.   DECISION OF THE ALJ

On January 12, 2017, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 20-29.) At Step Two the ALJ found that plaintiff had severe impairments including a right knee meniscus tear, the residual effects of a prior heart attack, peripheral neuropathy, hammertoes, claw toes, asymmetrical sensorineural hearing loss and tinnitus not corrected by hearing aids, the residual effects of prior burns including a restricted range of motion due to contractures of the skin, and bilateral carpal tunnel syndrome with residual effects following release surgeries. At Step Three, the ALJ found that he did not

have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. part 404, subpart P, appendix 1. (Tr. 22-23.)

The ALJ then determined that plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) except he should never use hand controls with either hand. He could frequently reach overhead and in all directions with either arm, but could only occasionally handle and finger with the right and left hands. He could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He should never be exposed to unprotected heights, moving mechanical parts, or vibration, and can never operate a motor vehicle as a job duty. He could work in an environment with a moderate noise level. (Tr. 23.)

At Step Four, the ALJ found that he was unable to perform any past relevant work as a greenskeeper, machine operator, or auto mechanic. However, the ALJ found that plaintiff's impairments would not preclude him from performing work that exists in significant numbers in the national economy, including light and unskilled work as a counter clerk, furniture rental consultant, and boat rental clerk. Consequently, the ALJ found that plaintiff was not disabled. (Tr. 28-29.)

## IV.  GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id.* As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial

evidence exists in the record that would support a contrary outcome or because the Court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his condition meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to his PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

Plaintiff argues the ALJ erred in failing to find at Step Two that his HIV was a severe impairment. He argues that the record evidence demonstrates that his HIV--an

established, diagnosed, and treated condition--which has existed throughout the entirety of the record--causes more than slight limitations. The Court agrees.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). The claimant bears the burden of proving his impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been made must be resolved in favor of the claimant. Id.; Dewald v. Astrue, 590 F. Supp.2d 1184, 1200 (D.S.D. 2008). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard. . . ." Kirby, 500 F.3d at 707. A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to perform basic work activities. See 20 C.F.R. §§ 404.1520(c), 404.1521. An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. Kirby, 500 F.3d at 707; 20 C.F.R. § 404.1521(a). Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 404.1521(b). Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id. The sequential evaluation process terminates at Step Two if the impairment has no more than a minimal effect on the claimant's ability to work. Kirby, 500 F.3d at 707; Hudson v. Bowen, 870 F.2d 1392, 1396 (8th Cir. 1989).

Here, the ALJ determined at Step Two that the record supported the presence of severe medical impairments including, right knee meniscus tear, the residual effects of a prior heart attack, peripheral neuropathy, hammertoes, claw toes, asymmetrical sensorineural hearing loss and tinnitus not corrected by hearing aids, the residual effects of

prior burns including a restricted range of motion due to contractures of the skin, and bilateral carpal tunnel syndrome with residual effects following release surgeries.

With respect to plaintiff's HIV, the ALJ stated:

> Plaintiff had been diagnosed with HIV; however, this condition is well controlled on medications. With medication and treatment, the claimant's viral load decreased (Exhibit 3F/4). The record is devoid of any HIV related complications. In fact, the record does not support a conclusion that the claimant's HIV or AIDS caused more than a minimal vocationally relevant limitation for a period of 12 months or more.

(Tr. 23.)

The record evidence concerning plaintiff's HIV is well-developed, referencing plaintiff's HIV impairment and how it causes more than a slight limitation. For example, plaintiff was hospitalized in September 2014 due to complications from untreated HIV and was started on HAART and other HIV medications. (Tr. 314.) On September 22, 2014, plaintiff was hospitalized again following a dog bite due to lowered immunity status from HIV. (Tr. 353.) On October 3, 2014, plaintiff's lymph nodes had increased in size and he had ongoing numbness. (Tr. 346.) On May 12, 2015, he was seen at the infectious disease clinic for HIV follow-up. (Tr. 356.) He was seen at Missouri Orthopedic Institute on July 1, 2015 for bilateral hand medial neuropathy. Dr. Collard opined that the neuropathy in plaintiff's elbows and extremities was likely related to his medications and disease process, rather than any work-relatedness. (Tr. 364.) On September 11, 2015, plaintiff was seen at the infectious disease clinic for HIV follow-up when his HIV medications were adjusted. Plaintiff had symptoms of bronchitis for over 2 weeks that did not improve with over the counter medications. (Tr. 375-77.) On December 1, 2015, he returned to the Infectious Disease Clinic for HIV follow-up when he reported tinnitus with possible hearing loss and occasional vertigo. (Tr. 379-81.) On December 21, 2015, plaintiff was seen at an otolaryngology clinic for ringing in his ears for more than a year, believed to be a possible side-effect of his medications. (Tr. 386-88.) On May 24, 2016, plaintiff saw Dr. Salzer at the Infectious Disease Clinic for HIV follow-up. (Tr. 391-95.)

On August 17, 2016, plaintiff saw Dr. Volarich for an independent medical examination. He opined that plaintiff had a 40% permanent partial disability due to HIV/AIDS infection and accounting for peripheral neuropathy involving the upper and lower extremities. (Tr. 400-15.)

The record is clear that the general finding by the ALJ that plaintiff's HIV impairment "caused [no] more than a minimal vocationally relevant limitation for a period of 12 months or more" (Tr. 23) is not supported by substantial evidence. Given the low standard for determining impairment severity, the ALJ erred at Step Two of the sequential evaluation process. Further, substantial evidence unequivocally supports a finding that plaintiff's HIV impairment is severe. The Court reverses the final decision of the defendant Commissioner and remands the case for general reconsideration of plaintiff's disability applications with his HIV impairment considered severe.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded. An appropriate Judgment Order is filed herewith.

/s/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 11, 2019.